JOHN A. LOVE, Appellant, v. CITY OF DES MOINES, Appellee.

No. 39549.

April 14, 1930.

*Lehmann, Seevers & Hurlburt,* for appellant.

*F. T. VanLiew, Charles Hutchinson,* and *Chauncey A. Weaver,* for appellee.

EVANS, J.—The certificates in suit were drawn payable to bearer. They were issued for the benefit of the Moreno-Burkham Construction Company, and were delivered to said company. On  the date of their issue, February 18, 1921, they were so delivered, pursuant to a resolution of the city council of Des Moines, adopted on the date of their issuance. The plaintiff sues upon the certificates, as the present holder thereof. No question of negotiability, whereby the plaintiff should be deemed to stand in any better position than the original holder, is presented. The plaintiff introduced no testimony upon which to predicate a claim of immunity against any defense good as against the original holder. For convenience of speech, we shall, therefore, refer to the Moreno Company as though it were the plaintiff herein. This company was a sewer contractor. Brooks was its sole representative in all the transactions and conversations considered herein. For convenience of discussion, we shall, therefore, refer to the plaintiff as personified in Brooks. In February, 1917, he obtained a sewer contract from the city of Des Moines for construction of what is known in the record as the Highland Park sewer. The contract was properly let, pursuant to statutory procedure. It called for a compensation to the contractor of somewhat more than $84,000. The contractor entered upon the performance of the contract on March 2, 1917, and so continued until the latter part of July of the same year. In that year, the great enterprise of building Camp Dodge in the outskirts of the city was in progress. This was an enterprise of the United States government. Brooks had sought, with great importunity, to get a part of the contracting work to be let in the construction of said camp, but had failed. His failure was followed, within a few days, by an invitation, and by an intimation of a command, by the military officer in charge of the proposed camp, that he transfer his equipment from Highland Park to the Camp Dodge site, for the purpose of constructing there some 27 miles of sewer trenches. He informed various members of the city council either that he was commandeered by the Federal government or that he would be so commandeered, if

necessary, and he requested their permission to suspend operations upon the Highland Park contract, and that they give him an extension of the date of completion, which had been fixed in the contract as December 1st. Assent was had to his request. He testified, also, that he requested that the city indemnify him against any loss by reason of the delay, and that this was assented to by the several members of the city council. Work was suspended on the Highland Park contract until about the first of October, when it was again resumed by the contractor. It was completed about the middle of June, 1918. In the same month, he filed a claim with the city council for loss sustained by reason of delayed performance of the contract, to the amount of more than $44,000. Shortly thereafter, a full settlement under the contract was had, whereby there was paid to the contractor, through his assignee, the sum of $98,000 plus. What the occasion was for paying $14,000 in excess of the contract price is not disclosed in the record. In March, 1919, the contractor filed again the same claim. He filed it again in November, 1919. In that same month, an agreement of compromise was entered into, whereby the city council adopted a resolution proposing to pay the contractor the sum of $25,000 in full of his claim, on condition that legislation should be secured, validating such payment. On February 14, 1921, the legislature passed Chapter 348, Acts of the Thirty-ninth General Assembly, purporting to legalize ''certain obligations of cities and towns made under pressure of war conditions.''.

Pursuant to this legislation, the city council of Des Moines, on February 18th, readopted, in substance, its resolution of November, 1919, and directed the issue of the certificates of indebtedness. Shortly thereafter, and on March 12th, the city council rescinded its resolution, and purported to cancel the certificates, and gave notice accordingly.

One of the defenses interposed is that the resolution of February 18, 1921, including the issuance of the certificates thereunder, was void for failure to observe the requirements of Section 6553, Code, 1927, this requirement being that the resolution appropriating money should lie over for public inspection for one week before final adoption. We shall have no occasion to consider this question, nor to predicate any decision thereon.

One of the defenses also is that the contractor falsely represented to the members of the city council that he had been com-

mandeered by the United States military authorities, whereas, in fact, he had not been so commandeered; that he transferred his equipment from Highland Park to Camp Dodge voluntarily, and not under compulsion. We shall have no occasion to consider this issue. Whether he was commandeered or not, the claim as presented to the city was not predicated upon that ground.

The defense of want of consideration is interposed. The plaintiff pleads the compromise as the consideration. The term "consideration" in this connection carries a twofold significance, and the distinction between the one and the other is to be observed. Consideration, as the term is ordinarily used in defense to a contract, inheres in a compromise. The mutual yielding of ground by the disputants ordinarily operates as a mutual consideration binding upon both. If, therefore, this were a case between individuals alone, and if the plaintiff's claim were made in good faith, a compromise for a lesser sum might not be subject to the defense of want of consideration. We need not here decide.

The other significance of the term "consideration" extends further back, and must be found pre-existent to the compromise itself. One of the fundamentals of popular government is that the power of taxation and of the expenditure of taxes shall not be exercised for private benefit, or for the purpose of mere gratuities to private interests. This fundamental principle has its recognition in Section 31 of Article III of our Constitution, as follows:

"No extra compensation shall be made to any officer, public agent, or contractor, after the service shall have been rendered, or the contract entered into; nor shall any money be paid on any claim the subject-matter of which shall not have been provided for by pre-existing laws, and no public money or property shall be appropriated for local or private purposes, unless such appropriation, compensation, or claim, be allowed by two thirds of the members elected to each branch of the general assembly."

Generally speaking, it is vital to the legality of any and every payment or promise of public funds that there shall be a consideration therefor in the nature of a *public* benefit. If there

 be want of consideration in this case, this is its nature. We direct our first inquiry, therefore, to the mutual rights and obligations of the city of Des Moines and its city council, on the one hand, and to those of the contractor, on the other, in June, 1917. Our second inquiry will be directed to a consideration of the legislative act, Chapter 348, and its operation and effect, if any, upon the mutual rights and obligations of the parties.

I. In June, 1917, the contractor was operating under the benefits and obligations of a contract perfect in legal effect. He was under obligation to perform it. Upon performance, he was entitled to receive the contract price. He could not be required to accept less, nor permitted to demand more. The power of the city council over the contract and its compensations was limited by the terms of the contract itself. They were bound to pay in full. They were not bound to pay more. Not only so, but they were bound *not to pay more*. If, by any specious plea, their sympathies had been won, whereby they had desired to add a bonus to the compensation of the contractor, they had no legal power to perform the wish. To perform it would be illegal. The contractor performed his contract, and through his assignee, drew his compensation in full. This was, of legal necessity, full satisfaction of every obligation of the city in relation thereto.

The plaintiff testified that he told various members of the council, and perhaps each of them, that he must be indemnified for such loss as he might sustain by reason of the call of the Federal government, and that each member assented to his demand. Though it would seem that such a request would be more appropriately made upon the Federal government, which called for his services, than upon the city council, which was tolerating a suspension thereof, we raise no question as to its inherent improbability. The evidence itself was wholly incompetent and inadmissible for the purpose of establishing a legitimate claim against the city. He might as well have exacted such a promise from any other citizen of the city as from its councilmen. The authority of one was neither greater nor less than that of the other, to bind the city to such a promise. The obligation of the city was in no manner affected by such conversations with city councilmen, if any there were. It must be said, therefore, that,

prior to November, 1919, the city was not under obligation to pay any part of the alleged loss under this contract. Nor was there any legal power in its city council to add to the compensation already paid. It appears from the record that, in November, 1919, the city council adopted, conditionally, the compromise resolution. The theory of the appellant is that, though he may have had no case before the compromise, he did have a case after the compromise, in that the compromise itself created the case.

If the city council was lacking in power to pay the $44,000, it was under equal disability to pay any part of it. If it had legal power to pay the $44,000, and if, notwithstanding its power, it was contesting the claim as being an unjust one, then it might have power to agree upon, and to pay, a lesser sum. It might have power to compromise upon a lesser sum. In such event, it might be bound by the compromise, like any other litigant. But if the power to pay was wanting in the first instance, the city council could not derive such power from its own act in entering into a compromise. Lacking power to pay, it lacked power to compromise. The compromise, therefore, added nothing to the legal standing of the contractor upon his claim. The proposed appropriation was indisputably a bonus,— a private gift without *public* benefit in any sense.

The argument for the appellant at this point is that, in the compromise itself, the defendant city received *a public* benefit, and that it has ever since retained that benefit, and that it must,  therefore, respond to the fair requirements of the contract of compromise. As authority for this contention, the appellant relies upon a line of our cases, such as the following: *Hansen v. Town of Anthon*, 187 Iowa 51; *Marion Water Co. v. City of Marion*, 121 Iowa 306; *First Nat. Bank v. City of Emmetsburg*, 157 Iowa 555; *City of Des Moines v. Horrabin*, 204 Iowa 683.

The cited cases are authority for the proposition that a city may be held liable for *public* benefits received and retained pursuant to a purported contract *which the city had power to make*, but which failed in validity because of defective procedure by the city council. To quote from the first cited case, *Hansen v. Town of Anthon*:

"*No actual want of power in the town to make such a contract is involved.* Only the procedure is assailed."

In that case, the town was held liable for the fair value of the services rendered under the purported contract, which it had received and fully retained. In the *Emmetsburg* case, a sewer contract was involved. The power of the city to enter into the contract by proper procedure was unquestioned. After the performance of the contract by the contractor, the contract was found void for want of proper procedure. We held an estoppel against the city to renounce a contract which it had power to make, after its full performance by the other party. In the *Horrabin* case, the city had entered into a valid paving contract with Horrabin. Because of the long delay of the city in bringing the street to grade, for the purpose of enabling the contractor to enter upon the performance, until long after the date of completion fixed in the contract, the contractor refused to proceed thereunder. The breach of contract was wholly upon the part of the city. In the meantime, a substantial advance in cost of materials and labor had resulted. The contract price had been fixed at $2.36 per square yard. In order to induce the contractor to proceed, the city purported to raise the contract price to $2.90. The contractor accepted the offer, and performed the contract in full. Settlement was made with him upon the basis of the new offer or compromise. Four years thereafter, the city brought an action to recover the excess amount paid. The procedure whereby the city council raised the price was irregular. The irregularity was such as to have avoided the contract while it remained executory. We applied the rule of estoppel in that case, likewise.

Indeed, it is broadly true that, where a city council has entered into a contract which is within its power to make, and where such contract is fully performed, to the full benefit of the city, and where the validity of the contract fails, for lack of formality or procedure in the adoption thereof, the city will be estopped, while retaining the benefits, to plead *ultra vires*. This doctrine is never applied, however, to the validation of any contract where the city council purports to do what it has no power to do by any procedure. Nor can such rule, in the very nature of it, be applied to a case where no *public* benefit was received.

The "public benefit" for which appellant contends, as a consideration in the case before us, is the mere fact that the con-

tractor reduced his claim from $44,000 to $25,000, and thereby re-linquished his claim to the amount of $19,000. This was not a "public benefit," within the ordinary acceptance of the term. As we have already indicated, the plaintiff, prior to the compromise, had no color of right, either legal or moral, and it was a clear breach of legal duty on the part of the city council to purport to pay any part of it. We need not dwell upon, or even enter into, the alleged moral obligation of the city. It seems to have been supposed that new standards of obligation came into vogue in 1917, and that moral obligations sprang up out of a "war psychology," and out of an external patriotism, and out of the mutual desire of all the citizens of the community to repel all appearance of being "slackers." The grounds upon which the plaintiff predicates his claim of moral obligation are indicated by the following excerpts from his communications to the city council. From the first claim presented to the city council we quote the following:

"We moved to Camp Dodge at the earnest solicitation of the army authorities, and only in order that the necessary sewer and water lines there might be installed in time for use last fall. The completion of the Camp Dodge sewer and water system was presented to us as an absolutely essential condition for the city of Des Moines and its contractors to meet in connection with the obligations assumed for the community at the time the camp was located here. Inasmuch as we did our very utmost to enable the community to redeem its promises to the war department, and in so doing, ran ourselves into a net cash loss of $36,199.48, we submit the matter for the earnest consideration of your honorable body, and request that the city of Des Moines, whose good name so largely benefited by the whole-hearted efforts put forth by all the builders of Camp Dodge, shall in some appropriate way assume this loss which was sustained by us and due to causes altogether beyond our control."

The claim was renewed in March, 1919, and the same was accompanied with a letter addressed to the commissioner of public improvements, Mr. Budd. The basis of the claim is stated therein as follows:

"Owing to the long interruption in the work we saw that a loss was inevitable and showed you and Mr. Kastberg articles

where Eastern contractors who stopped work on city, county and state work in order to assist on U. S. emergency war work, on their return had refused to go back on conclusion of the war work unless guaranteed against loss and in numerous cases they were taken care of. We also told you and Mr. Kastberg that we would finish our contracts under the old prices, but would ask for some relief. * * * Understand Mr. Budd I am not presenting this to you as a legal claim, but I do believe that your sense of justice admits that we have a just moral claim for the simple reason that emergency war requirements demanded our help so that the sewer and water systems of Camp Dodge could be completed as guaranteed by the City of Des Moines through its Chamber of Commerce and business men.''

It will be seen from the foregoing that the only basis of obligation set forth by the plaintiff was a mere appeal to the good will of the city council because of the creditable circumstances under which the plaintiff had suffered loss. We do not by any means belittle the high business standard adopted by the contractor in the resolute performance of his contract according to its terms, while facing certain loss. He might indeed have arbitrarily abandoned his contract, and thereby forced the city either to seek legal redress in damages or to suffer the loss, rather than to choose litigation.

Having met this high standard, he was entitled to its natural rewards. One of these rewards was the respect and confidence of the business world. But he was not entitled to money remuneration for his loss. It was the very absence of such right that gave the quality of virtue to his full performance.

Why remuneration should be demanded from the city, rather than from the Federal government, is not apparent from this record. We may safely say that the Federal government has long established a reputation for liberality in its compensations for contractual services. Throughout the period of the war, no contractor was commandeered or threatened to gratuitous service.

In any event, the city council had no responsibility, legal or moral, for the losses sustained by the contractor. Nor would the voluntary payment of the contractor's claim bring to the city, either directly or indirectly, any ''public benefit'' whatever. Long before any resolution by the city council, the sewer contract had been fully performed, pursuant to the obligation as-

sumed by the contractor in his written contract. Full settlement
was had under the contract. If the contractor's claim for re-
coupment of his loss should be deemed pending prior to the
settlement, then it was extinguished by the settlement. If such
claim is to be deemed an independent one, arising after the
settlement, by virtue of the resolution of November, 1919, then
the resolution was purely voluntary, and contemplated no re-
turn or benefit for the public.

Unless, therefore, validity or life was breathed into this
resolution by subsequent legislative act, then the claim of the
contractor and the resolution of the city council must be deemed
without force or effect. We turn, therefore, to a consideration
of the legislative act.

II. It is contended by the appellant that Chapter 348, Acts
of the Thirty-ninth General Assembly, was effective to give valid-
ity to the resolution of November, 1919, and to authorize the
later resolution of February 18, 1921. The ar-
gument is that, under the final proviso of Sec-
tion 31, Article III, of the Constitution, the
legislature had the power to authorize the pay-
ment of extra compensation, notwithstanding the
absence of ''public benefit'' therefrom. This sug-
gests the consideration of two questions:

(1) What meaning or interpretation is to be put upon
Chapter 348, which is as follows:

''An act legalizing certain obligations of cities and towns
made under pressure of war conditions and authorizing the
payment thereof.

''Be it enacted by the General Assembly of the State of
Iowa:

''Section 1. Cities and towns which during the World
War were compelled to, or deemed it advisable and for any
reason did, prior to January 1, 1920, by contract, resolution or
ordinance, unconditionally or conditioned upon the legalization
thereof, allow or agree to pay additional compensation to con-
tractors for public improvements because of the réquirement or
use by the government of the United States of equipment or
material of the contractor, said cities and towns are hereby
authorized to make payment of such excess either out of their

general fund or the grading and improvement fund, and all such excess allowances and the payment thereof are hereby legalized.''

(2) What are the scope and application of the final proviso of Section 31, Article III, of the Constitution?

We take up the second question first.

We have already quoted herein Section 31, Article III, under which it is claimed by appellant that the legislature was authorized to enact Chapter 348. This power is to be found, if at all, in the closing proviso of the section:

''Unless such appropriation, compensation, or claim, be allowed by two thirds of the members elected to each branch of the general assembly.''

It is the claim of the appellant that we should take judicial notice of the vote by which the general assembly passed Chapter 348. As an aid to our judicial notice, we are advised in the brief that the act was passed with approximate unanimity in both houses of the assembly. We accept the assurance of counsel in that respect. We will assume the fact thus stated, without passing upon the question whether it comes within the fair range of our judicial notice.

What, then, is the effect of this proviso? The body of Section 31 is emphatically prohibitive. Its prohibition operates as a limitation of power, not only upon the legislature, but upon every city council in the state. The closing proviso of this section lifts the prohibition qualifiedly. It withdraws it from ''such appropriation, compensation, or claim'' as shall be allowed by a two-thirds vote of each branch of the general assembly. This is the sole exception. The proviso confers no power of general legislation on the subject-matter of Section 31. It implies a particular proposed appropriation, compensation, or claim, and the consideration by the legislature of the pros and cons of ''such appropriation'' et seq. As to ''such appropriation'' et seq., it confers a power of discretion, to be exercised by a two-thirds vote of each branch of the legislature. Of necessity, both by the terms of the proviso and by its very nature, it can apply only to legislative appropriation. Even if it were possible thereunder for the legislature to consider the proposed appropriation pending before the city council of Des Moines, and to approve the same by a two-thirds vote, and thereby to authorize its payment by the city of

102

Des Moines, yet nothing of that kind was done. The legislature did not consider "*such* appropriation," nor the pros and cons thereof. It simply purported, if anything, to confer general power upon all city councils to pay all obligations incurred by them under war pressure prior to January 1, 1921. The proviso conferred no such power of general legislation. The legislature could not thereunder have enacted a general statute conferring upon itself the future power to allow that *class* of claims. Its power of discretion was confined to each particular proposed appropriation which should command a two-thirds vote. The language of the proviso forbids the implication that the power of discretion conferred upon the legislature could be exercised by, or delegated to, other inferior legislative bodies. Chapter 348 purported to confer upon city councils generally a larger power of discretion than the legislature itself had, under the proviso.

We are of opinion, therefore, that no power exists in a city council to appropriate public moneys to private use without "public benefit," and that no such power can be conferred upon it by legislative act. We have no occasion to consider other features of the record.

The judgment of the district court is—*Affirmed.*

All the justices concur.